UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| THE ESTATE OF ETHAN AUSTIN MURRAY, by and through its personal representative, Justine L. Murray, JUSTINE L. MURRAY, in her individual capacity, and MARK JENTSCH, in his individual capacity, <br><br> Plaintiffs, <br><br> v. <br><br> SPOKANE COUNTY; and JOSEPH M. WALLACE, in his individual capacity, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS (42 U.S.C. § 1983) AND FOR THE STATE TORT OF NEGLIGENCE** <br><br> **(JURY DEMAND)** |

Plaintiffs, through undersigned counsel, hereby allege:

## INTRODUCTION

This is a civil action brought by the Estate of Ethan Austin Murray, Justine L. Murray, and Mark Jentsch, related to the officer-involved shooting death of an unarmed mentally ill man, Ethan Austin Murray ("Ethan"), in Spokane Valley, Washington on May 4, 2019.

On that date, Defendant Joseph M. Wallace, a law enforcement officer employed by Defendant Spokane County, contacted Ethan for a "disorderly person" call near an apartment complex. Defendant Wallace needlessly pursued Ethan into a wooded area more than one hundred yards away from the apartment buildings and any citizens. At no time did Defendant

*Murray v. Spokane County et. al.*
COMPLAINT – Page 1 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

Wallace, a Marine veteran with special forces experience and current member of Defendant County's SWAT team, utilize any de-escalation techniques to diffuse the situation. Further, Defendant Wallace did not possess a taser at the time of the incident and, instead, relied solely on lethal force.

Ultimately, Defendant Wallace shot Ethan five times, sending Ethan tumbling to the foot of an embankment where he suffered and died. Defendant Wallace justified the shooting by claiming Ethan had threatened Defendant Wallace with a knife. A knife was found at the scene and marked as evidence, only to be later removed from evidence without further investigation when another Defendant County employee claimed it belonged to him and had fallen from his pants while performing scene security after the shooting.

Defendant Wallace's official report was released 30 days after the shooting and prepared with the assistance of a criminal defense attorney. Material differences between Defendant Wallace's statement and forensic evidence undermine the credibility of the statement. Even if Defendant Wallace's statements were entirely reliable, they demonstrate a profoundly inept approach to the final encounter that led directly to Ethan's death.

In short, there was no justification for Defendant Wallace chasing the unarmed, sober, and obviously mentally ill Ethan into the woods, and no justification for shooting him to death.

## I. **PARTIES**

1.1    Plaintiff Estate of Ethan Austin Murray ("Estate") was duly formed in Spokane County Superior Court (Cause No.: 20-4-00665-32) for the purpose of bringing this action and seeking redress for the death of Ethan Austin Murray. Plaintiff Justine L. Murray, in her representative capacity, is the duly-appointed personal representative of the Estate. As personal representative of the Estate, Ms. Murray is qualified to bring this action and assert all claims

*Murray v. Spokane County et. al.*
COMPLAINT – Page 2 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

1    alleged herein on behalf of the Estate, including all claims arising under 42 U.S.C. § 1983 and

2    for all damages suffered by all statutory beneficiaries provided for under RCW 4.20.020.

3        1.2    Plaintiff Justine L. Murray ("Justine"), in her individual capacity, is the mother

4    of Ethan Austin Murray. She is a resident of Sandpoint, Idaho. She is entitled to assert claims in

5    her individual capacity for the loss of society and companionship of her son under 42 U.S.C. §

6    1983 as well as Washington state laws including RCW 4.24.010.

7        1.3    Plaintiff Mark Jentsch ("Mark"), in his individual capacity, is the father of Ethan

8    Austin Murray. He is a resident of Chicago, Illinois. He is entitled to assert claims in his

9    individual capacity for the loss of society and companionship of his son under 42 U.S.C. §1983

10   as well as Washington state laws including RCW 4.24.010.

11       1.4    Defendant Spokane County ("Defendant County") is an administrative and

12   political subdivision of Washington State, organized under Washington State law.

13       1.5    Defendant Joseph M. Wallace ("Defendant Wallace") is a resident of the Eastern

14   District of Washington and, at all times relevant to this action, acted under color of state law and

15   as an agent of Defendant County.

16   **II. <u>JURISDICTION AND VENUE</u>**

17       2.1    This action is brought pursuant to 42 U.S.C. § 1983 for violations of the United

18   States Constitution and for the state law tort of negligence.

19       2.2    This Court has jurisdiction over these claims pursuant to 28 U.S.C §§ 1331, 1343,

20   and 1367.

21       2.3    Venue is appropriate in the United States District Court for the Eastern District

22   of Washington at Spokane pursuant to 28 U.S.C. § 1391 because the events giving rise to

23

24

*Murray v. Spokane County et. al.*
COMPLAINT – Page 3 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

Plaintiffs' claims occurred in this District and because Defendants reside and exist in this District.

### III. **PROCEDURAL REQUIREMENTS**

3.1     Plaintiffs provided Defendant County with notice of Plaintiffs' claims on May 7, 2020 and May 11, 2021 respectively, more than 60 days before filing this suit, satisfying the waiver of sovereign immunity under state law. *See,* RCW 4.96.020.

### IV. **FACTS**

4.1     At age nineteen, Plaintiff Justine Murray gave birth to her first and only son, Ethan. Ethan's father was Mark Jentsch. Ethan was Mark's only son. Less than two years later, Justine gave birth to Ethan's only sibling, his sister, Cora, Mark Jentsch's only daughter.

4.2     As a single working-class mother, Justine raised her children to respect police and work hard.

4.3     Ethan was a smart, funny child who loved the outdoors.

4.4     Ethan began exhibiting symptoms of mental illness in high school and was later diagnosed with schizoaffective disorder.

4.5     After earning a high school graduation equivalency degree, Ethan worked a series of entry-level jobs, but continued to struggle with mental illness.

4.6     Over the next several years, Ethan cycled in and out of Justine's home in Sandpoint, Idaho, always returning to Justine.

4.7     When Ethan was home, Justine helped him meet medical, employment, and other basic needs.

4.8     When Ethan was away, Justine worried about him.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 4 of 29

Mazzone Law Firm, PLLC
3002 Colby Avenue, Suite 302
Everett, WA 98201
T: (425) 259-4989

4.9    Justine dedicated herself to learning as much as she could about mental illness. She founded a local campaign to bring greater attention and sensitivity to the community's growing mental health crisis and the prejudice and challenges faced by people living with mental illness.

4.10    In 2017, Ethan was arrested in Florida for a public disturbance related to his mental illness. He was held for extended treatment, during which time he was regularly visited by his maternal grandmother. Justine traveled to Florida to visit Ethan and stayed in touch with phone calls and letters. Upon Ethan's release in November 2018, he again came home to Justine.

4.11    Ethan spent that winter in Sandpoint with Justine, going on hikes and making plans for the future.

4.12    In February 2019, Ethan decompensated.

4.13    The last time Justine saw Ethan alive was in Sandpoint, Idaho, on March 13, 2019.

4.14    Perhaps because of his mental illness, Justine and Ethan were especially close throughout Ethan's life. Justine always loved Ethan dearly. Having given birth to him at a young age, and having raised him for many years, Justine thinks of herself as having grown up with Ethan.

4.15    Mark Jentsch's only son was Ethan Austin Murray.

4.16    During his lifetime, Mark Jentsch regularly supported his son up until the age of eighteen.

4.17    At age nineteen, Ethan came to live with Mark, who got his son a job at his company, SECO Refrigeration, working alongside his father; unfortunately, Ethan did not enjoy that type of work.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 5 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.18    Mark asked Ethan what type of career he wanted, offered to send him to school and to fund his education to accomplish Ethan's goals.

4.19    Ethan indicated that he would like a career in the culinary arts.

4.20    As a result, Mark made some calls to people he knew and took Ethan to Rick Bayless and The Alinea Group, to show him what would be involved in establishing such a career.

4.21    After learning the number of years it would take to become a professional chef, Ethan told Mark that he would prefer to open his own restaurant and become a chef that way. Unfortunately, the resources to undertake such an endeavor were not available to Ethan or Mark.

4.22    At that point, Ethan went to live in Sterling, Illinois with a step-grandmother and kept in regular contact with Mark.

4.23    Later, Ethan decided to move out west and went to live with his mother Justine's ex-husband on his property in Washington.

4.24    Ethan told his father, Mark, that he wanted to try and make it on his own in Washington.

4.25    About two years prior to his death, Ethan came back to Illinois, in Humboldt Park, and texted Mark that he wanted to see him.

4.26    Mark and Ethan spoke on the phone that afternoon, and Mark picked Ethan up from Humboldt Park to take him to Logan Square.

4.27    Mark and Ethan had a serious discussion about how much they missed each other and what both had been doing while they were apart.

4.28    Mark offered to get Ethan into an HRDI facility to get Ethan cleaned up and into a job program.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 6 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.29    Unfortunately, the HRDI program would not be available for Ethan for at least four-to-six weeks; Mark wanted his son to stay with him but, unfortunately, that did not happen.

4.30    Ethan told Mark he had a friend in Jacksonville, Florida that had a job for him and could assist in getting him into a treatment program, so Mark offered and purchased Ethan a ticket to get him down to Florida.

4.31    While Ethan was in Florida, Mark continued to try and call his son. Unfortunately, around that time, Ethan had some run-ins with the law during what appeared to be mental breakdowns.

4.32    Mark left messages and told Ethan that if things did not go as planned in Florida, he was welcome to return to Chicago so that Mark could try and get him into the HRDI program.

4.33    A little over a year prior to his death, Mark spoke with Ethan. Ethan discussed coming back to the Chicago area.

4.34    At that time, Mark had some serious conversations with Ethan regarding his run-ins with the law in Florida. They discussed how Ethan was going to try and improve his life and rectify the situations in Florida.

4.35    Mark had been counseled that he needed to use tough love with Ethan, otherwise he was never going to make the necessary changes in his life on his own.

4.36    After that conversation, Ethan stopped answering Mark's calls, but Mark continued to hear from medical facilities informing him that Ethan had been admitted to hospitals on a short-term basis for treatment.

4.37    Mark attempted to have the hospitals admit or commit Ethan for long-term treatment, but they informed Mark that they could not do so without Ethan's consent.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 7 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.38    From that time forward, up until the point of his death, Mark continued to try and search for Ethan.  But, at that point, Ethan had no phone and had become homeless while living out west.  Since that time and up until the present day, Mark thinks about Ethan and misses him.

### Ethan's Contacts with Law Enforcement on May 2, 2019

4.39    Around noon on May 2, 2019, approximately 53 hours before he was killed by Defendant Wallace, Ethan was contacted by officers employed by Defendant County and the Spokane Police Department (SPD) for a reported disturbance at a local diner.

4.40    Officers quickly determined that Ethan had difficulty communicating and was showing obvious signs of mental distress. The written report for this contact indicates that Ethan put his own money in his mouth and started "*growling and chewing the bills.*" The officers noted that Ethan was "*rambling*" and that he "*would speak normally then completely go off track and start talking about the government following him . . . . His demeanor was 'off' and he appeared unstable. . .*"

4.41    Ethan cooperated as officers handcuffed and removed him from the diner, identified and arrested him on a misdemeanor warrant, and booked him into the Spokane County jail.

4.42    Records for this contact do not indicate that Ethan was either armed or aggressive.

4.43    Records for this contact also do not indicate that Ethan was in possession of sunglasses, the significance of which will be addressed below.

### Ethan's Contacts with Law Enforcement on May 3, 2019

4.44    Having been released from jail for unknown reasons, at 10:45 a.m. the following day, May 3, 2019, approximately 31 hours before the shooting, Ethan was contacted by multiple SPD officers for a reported disturbance in an alley of a residential neighborhood.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 8 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.45    Again, officers quickly determined that Ethan had difficulty communicating and was showing obvious signs of mental distress. Their written report described Ethan as "*having a conversation with the air. I asked him who he was talking to, and he responded 'his friend.' . . . Ethan continued to talk to himself . . .*"

4.46    The officers identified Ethan and asked him to leave the area; Ethan complied.

4.47    Records for this contact do not indicate that Ethan was armed, aggressive, or in possession of sunglasses.

4.48    Later that evening, approximately 20 hours before the shooting, Ethan was again contacted by multiple SPD officers for causing a disturbance in a local park.

4.49    Again, officers quickly determined that Ethan had difficulty communicating and was showing obvious signs of mental distress. One Officer's written report described Ethan as having "*writing all over his torso, arms and hands, and he removed a ballpoint pen from his pocket and continued to write on his hand. He showed me what he was writing, but he and the writing made no sense*."

4.50    Officers identified Ethan, located non-extraditable and non-bookable warrants, and released him at the scene.

4.51    Records for this contact do not indicate that Ethan was armed, aggressive, or in possession of sunglasses.

### **Ethan's First Contact with Law Enforcement on May 4, 2019**

4.52    At 7:45 a.m. the following morning, May 4, 2019, Ethan was contacted by two Defendant County employees, Deputies Thomas and Depriest, for a reported disturbance at a construction site located approximately two blocks from the undeveloped lot where the shooting would take place that afternoon, approximately 10 hours later.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 9 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.53    These deputies also quickly determined that Ethan had difficulty communicating and was showing obvious signs of mental distress. Deputy Thomas' written report described Ethan as "*rambling and having a hard time sitting still*" and that Ethan "*responded to a question about his phone number with a series of letters and numbers.*" He also noted that Ethan's "*hands were constantly moving and it appeared he was having a hard time focusing on a task.*" The officer also noted that Ethan was disheveled and disorganized.

4.54    Deputy Thomas noted that, after initially walking away, Ethan complied with orders to stop: Ethan raised his hands, sat down on the ground, allowed himself and his belongings to be searched, revealing no contraband.

4.55    After identifying Ethan and running his information through criminal justice system databases, the deputies released Ethan from the scene.

4.56    Records for this contact do not indicate that Ethan was armed, aggressive, or in possession of sunglasses.

### Ethan's Second Contact with Law Enforcement on May 4, 2019

4.57    Several hours later, at 12:15 p.m., two other Defendant County employees, Deputies Smith and Paynter, contacted Ethan for reported disturbances at an intersection and at a nearby chain pizza restaurant in Millwood, Washington, approximately three miles from the undeveloped lot where the shooting would take place at approximately 5:30 p.m. that same afternoon.

4.58    The deputies also quickly determined that Ethan had difficulty communicating and was showing obvious signs of mental distress. Deputy Paynter's written report described Ethan as "*distracted and disconnected from our contact with him*" and noted that his clothes, face, and hands were "*very dirty.*" Deputy Paynter noted that Ethan was not wearing shoes.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 10 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

Written reports from both Deputies Smith and Paynter express awareness that Ethan's appearance and behavior may have been the result of mental illness.

4.59    After initially crossing the street to avoid the deputies, Ethan stopped, complied, and provided accurate identifying information when asked to do so by the deputies.

4.60    Records for this contact do not indicate that Ethan was armed, aggressive, or in possession of sunglasses.

### Ethan's Third Contact with Law Enforcement on May 4, 2019

4.61    Forty-five minutes later, at 1:00 p.m., approximately 4.5 hours before Ethan was killed, Deputy Paynter was called back to the same neighborhood to re-contact Ethan, this time for a reported disturbance in a nearby shop.

4.62    Deputy Paynter noted that Ethan "*appeared the same*": having difficulty communicating, disheveled in appearance, and showing signs of mental illness.

4.63    Deputy Paynter's report indicated that he directed Ethan to return to "*where ever* [sic] *he was staying*."

4.64    Records for this contact do not indicate that Ethan was armed, aggressive, or in possession of sunglasses.

### Ethan's Contact with Defendant Wallace on May 4, 2019

4.65    At 5:26 p.m., two on-duty Defendant County employees, Defendant Wallace and Deputy Criswell, responded to a "disorderly person" call at the Parkside at Mirabeau apartment buildings in Spokane Valley, Washington.

4.66    The 911 caller indicated that a shirtless man was running around the apartment buildings' communal grass yard and that minors were in the vicinity.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 11 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.67    The untrained civilian 911 caller speculated that the man, Ethan, was intoxicated. However, **Ethan was mentally ill—not intoxicated**. The Washington State Patrol Crime Lab performed a post-mortem toxicology test, proving that Ethan had no intoxicating substances whatsoever in his system.

4.68    The 911 caller also reported that Ethan **had not assaulted anyone and did not appear to be armed**. The facts reported by the caller also did not suggest that Ethan was committing any crime. Rather, the caller suggested that Ethan was disturbing neighborhood tranquility.

4.69    Based on the 911 call and an uncorroborated passing comment by an unidentified woman, Defendant Wallace later wrote that he became concerned that Ethan's running around had "*potential[ly]*" threatened the minors.

4.70    Twelve minutes after the 911 call, Defendant Wallace and Deputy Criswell arrived on scene and contacted Ethan near a chain link fence marking the rear boundary of the apartment complex property.

4.71    The officers were located on the opposite side of the fence from Ethan. Both officers were located on the west side (the apartment-side) of the chain link fence, while Ethan was on the east side (in a large undeveloped lot where the shooting later occurred).

4.72    Both Deputy Criswell and Defendant Wallace noticed that Ethan had difficulty communicating and was showing obvious signs of mental distress. Deputy Criswell's written report indicates that he immediately noticed Ethan's "*unsteady gait*" and "*distant stare.*" When Criswell attempted to make verbal contact and banged his flashlight on the fence to get Ethan's attention, Ethan did not respond. Criswell's report also indicates that he noticed Ethan's

*Murray v. Spokane County et. al.*
COMPLAINT – Page 12 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

"*frenzied look*" and "*jittery*" movements. Defendant Wallace's written report indicates that he noticed Ethan acting "*erratically.*"

4.73    In response to Criswell's attempt to communicate by banging his flashlight on the fence, Ethan put his sweatshirt hood up and continued walking south, parallel to the fence line.

4.74    According to computer dispatch records, within ten seconds of Criswell's attempt to make verbal contact, Ethan turned away from the fence and began "*walking east into the woods*" of the undeveloped lot, away from the officers, minors, and apartment buildings.

4.75    As Ethan walked away, Deputy Criswell and Defendant Wallace began to look for a way to cross through the fence and pursue Ethan. The officers split up, traveling in opposite directions along the fence looking for a way to cross over into the undeveloped lot.

4.76    According to dispatch records, over the following two minutes Deputy **Criswell walked** north approximately 100 yards when he found a large hole in the fence where he could **step** into the undeveloped lot. He eventually caught up to Defendant Wallace, by which time the shooting was over.

4.77    At the same time, Defendant **Wallace ran** south approximately 100 yards, away from his fellow officer, to a place where the bottom of the fence was bent up enough that he could **crawl** beneath it.

4.78    Defendant Wallace's written report indicates that he took these aggressive actions due to his speculation that Ethan intended to walk all the way across the half-mile wide undeveloped lot to attack unseen civilians in the public park on the far side.

4.79    Alone, and without probable cause that Ethan had done anything other than ignore the officers, Defendant Wallace ran into the woods after Ethan.

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

1

**The Scene of the Shooting**

2    4.80    At all times material to this action, the undeveloped lot - the historic site of the

3 Inland Empire Zoo - was approximately one-half-square-mile in size and contained sparsely

4 wooded areas, large rocky outcroppings, and open fields. The undeveloped lot was bordered on

5 all sides by a chain link fence.

6    4.81    The following image depicts the approximate layout of the lot and surrounding

7 area, with the Parkside at Mirabeau apartment buildings marked in green, the chain link fence

8 marked in yellow, location of the shooting in red, and the distance between the fence and the

9 scene of the shooting (approximately 300-325 feet according to Google maps) marked in orange:



Image source: Google Maps, accessed 02/19/2021

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

1    4.82    The following image shows the approximate routes taken by the parties to the

2  scene of the shooting, with the chain link fence marked in yellow, Ethan's route marked in green,

3  Defendant Wallace's route marked in dark blue, Deputy Criswell's route marked in light blue,

4  the location of the shooting marked in red, and the distance between the fence and scene of the

5  shooting (approximately 300-325 feet according to Google maps) marked in orange:



Image source: Google Maps, accessed 02/19/2021

17    4.83    The following image shows the "*whispy tree*" (marked in red) where Defendant

18  Wallace claims he and Ethan were standing when the shooting happened:

19  / / / /

20  / / / /

21  / / / /

22  / / / /

23  / / / /

24  / / / /

*Murray v. Spokane County et. al.*
COMPLAINT – Page 15 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

Image source: file "2019-10059590_428 Redacted" (Ethan's body redacted by black box).

The above image and many others from the scene show that Defendant Wallace's line of sight in and around the scene of the shooting was unobstructed and posed no significant obstruction for a reasonable officer, especially one with Wallace's highly specialized tactical training and experience.

## **The Shooting**

4.84    According to computer dispatch records, the shooting unfolded in short order after Defendant Wallace began chasing Ethan into the woods:

| 5:41:20 p.m. | "[Ethan] is running" |
| 5:41:24 p.m. | "east up the hill" |
| 5:41:42 p.m. | "almost with [Ethan]" |
| 5:42:03 p.m. | "code" |
| 5:42:08 p.m. | "threatening me, saying something in pocket" |
| 5:42:15 p.m. | "shots fired" |

4.85    Defendant Wallace shot Ethan at least five times: in Ethan's head, chest, and arms.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 16 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.86    One bullet entered through the top of Ethan's skull and passed **downward** through his brain, exiting near Ethan's left ear.

4.87    A second bullet entered through Ethan's chest above his left nipple and passed **downward** through his 5th rib, the upper and lower lobes of his left lung, and the outer surface of the left ventricle of his heart, coming to rest in the lower rear chest cavity.

4.88    A third bullet entered through Ethan's chest below his left nipple and passed **downward** through his 6th rib, the lower lobe of his left lung, and the outer surface of the left ventricle of his heart, exiting through his lower back.

4.89    A fourth bullet entered and passed **downward** through the upper half of Ethan's left arm.

4.90    After passing through Ethan's arm, the fourth bullet re-entered Ethan's body at his left chest, passing **downward** through his 7th rib, the lower lobe of his left lung, stomach, and left kidney, coming to rest in the skin of his lower back.

4.91    A fifth bullet entered and exited through Ethan's left wrist, passing through skin, muscle, and both the carpal and radius bones.

4.92    According to Deputy Criswell's report, after receiving these injuries, Ethan was still alive, making "*high pitched groans*" and "*visibly breathing*." However, rather than provide immediate first aid, Criswell and Defendant Wallace waited at the top of the rocky outcropping for several minutes until a third officer arrived.

4.93    Eventually, Deputy Criswell and the third officer, Deputy West, approached and handcuffed Ethan before providing any care.[1]

---

[1] What Defendant Wallace did at the top of the outcropping while Deputies Criswell and West approached Ethan is unknown.

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.94    Medical professionals declared Ethan dead at 6:01 p.m., approximately twenty minutes after the shooting.

4.95    Prior to death, Ethan experienced terror, pain, and suffering on a scale that is impossible to quantify. He was chased through the woods by strangers, shot in the head, chest and arms, tumbled head over heels down a rocky outcropping, and cried out for help in a pool of his own blood, before being handcuffed like a criminal and dying. In a half hour, Ethan endured more trauma than any person should ever experience in a lifetime.

### Defendant Wallace's Evolving Statements about "*The Knife*"

4.96    Deputy Criswell's report indicates that, immediately after the shooting, Defendant Wallace claimed Ethan pulled "***a knife <u>or something</u>***" (emphasis added). This was - apparently -  the only public statement Defendant Wallace made about the shooting for the next 30 days.

4.97    Finally, on June 4, 2019, and only after investigators provided him with special access to privileged investigative materials (including dispatch records and audio recordings of radio traffic from the shooting), which were then unavailable to any other party or the public, Defendant Wallace issued his official written statement about the shooting, prepared with the assistance of criminal defense counsel.

4.98    The written statement contained none of the "***or something***" uncertainty about why Defendant Wallace had killed Ethan. In its place were a series of certain and specific details regarding "***the knife***":

> It had a black **handle** which I recognized as that of a **pocket knife**.
>
> I noticed a **silver or grey** glistening reminiscent of a **blade** from the end of the black **handle** . . .
>
> . . . his right hand still attempting to get **the knife** out of his pocket.

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

*Suddenly, [Ethan] pulled **the knife** out of his pocket, and I saw a flash of what appeared to be silver or gray which I believed was **the blade** of **the knife**.*

***He held it in his right clenched fist with the blade protruding from the bottom of his fist.***

*. . . clenching **the knife** with **the blade** facing toward me . . .*

*I fired until [Ethan] stopped advancing towards me with **the knife** . . .*

*I told [Deputy Criswell] I was OK, but that [Ethan] had a **knife**.*

*I was concerned [Ethan] still had **the knife** in his hands . . .*

(Emphasis added).

4.99    However, after an exhaustive search of the scene by dozens of officers, "***the knife***" was never located. No weapons were found on or anywhere near Ethan's body, nor anywhere near the "*whispy tree*," nor anywhere near the slope between the tree and Ethan's body.[2]

### Defendant Wallace's Blundered Approach

4.100    Investigators never interviewed Defendant Wallace.

4.101    However, in a brief follow-up to his belated written statement, investigators asked Defendant Wallace to indicate where he and Ethan were standing at the moment of the shooting. Using a black pen, Defendant Wallace marked his purported location with an "*X*" and Ethan's with an "*O*" on the following three photographs ("*whispy tree*" in red), indicating that the shooting occurred while the two were within extraordinary proximity to each other:

---

[2] Although investigators found no knife during the initial search, the next morning they did find a knife: approximately 100 feet away from Ethan's body, on the path investigators believed the parties had taken from the fence line to the scene of the shooting, a black handled folding knife was found and taken into evidence under "marker 1." However, a few days later, a Defendant County agent, Deputy Sullivan, submitted a sworn written statement claiming that the knife found at the scene was his, that it was not related to the shooting in any way, that he had accidentally dropped it while providing security during the night following the shooting, and that he had searched for it before leaving the scene. Despite the fact that this was Sullivan's second sworn statement and that it was **materially inconsistent** with his first sworn statement on all details regarding the knife, incredibly, investigators accepted it, **removed the knife from the chain of custody**, and returned it to Deputy Sullivan.

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989



Image source: Plaintiffs' bate stamp "Spokane-Murray "000060"



Image source: Plaintiffs' bate stamp "Spokane-Murray "000060"

*Murray v. Spokane County et. al.*
COMPLAINT – Page 20 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

Image source: Plaintiffs' bate stamp "Spokane-Murray "000059"

4.102   Defendant Wallace's written statement suggests that he and Ethan came within such close proximity "*suddenly*" and **unintentionally**:

> *I took a different path around and up the rock hoping to cut [Ethan] off. Once I emerged on top of the rock I suddenly came face to face with [Ethan]. [Ethan] was approx[imately] 6 feet away from me. . .*
>
> *. . . I had no way to back out or create distance between myself and [Ethan]. . . [Ethan] was so close to me that I had to hold my firearm close to my torso . . .*
>
> *. . . He began inching his way around the [whispy tree] towards me . . . his right hand still attempting to get the knife out of his pocket . . .*
>
> *. . . Now he was only approx. 5 feet away . . . Having no where to go, fearing for my life . . .*

4.103   Thus, if Defendant Wallace's narrative about unintentionally coming so close to Ethan is accurate, then it was this blundered approach within feet of an agitated subject, along with Wallace's failure to leave himself an escape route, that proximately caused the shooting.

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

However, Defendant Wallace's narrative may not be accurate, as it is inconsistent with both his recorded radio transmissions and his extraordinary level of tactical training and experience.

4.104  Defendant Wallace's recorded radio transmissions indicate he had a clear understanding of Ethan's location, movements, and route **during the minute** leading up to the shooting:

| | |
|---|---|
| 5:41:20 p.m. | "*[Ethan] is running*" |
| 5:41:24 p.m. | "*east up the hill*" |
| 5:41:42 p.m. | "*almost with [Ethan]*" |
| 5:42:03 p.m. | "*code*" |
| 5:42:08 p.m. | "*threatening me, saying something in pocket*" |
| 5:42:15 p.m. | "*shots fired*" |

These transmissions, combined with the wide open lines of sight in and around the scene of the shooting, suggest that Wallace could not have accidentally come within feet of the person he was actively pursuing without serious and inexcusable neglect.

4.105  Defendant Wallace's narrative about an unintentional close encounter is also inconsistent with his specialized training and experience with Defendant County's Special Weapons and Tactics ("SWAT") team, as an instructor with Defendant County's Reality Based Training and Field Training Officer programs, and as an active-duty U.S. Marine assigned to a special forces unit.

4.106  Despite the claim in Defendant Wallace's written statement about having deployed de-escalation techniques "*on numerous occasions with great success*," his actions leading up to the shooting demonstrate no awareness or skill in the subject. Chasing Ethan into the woods, not waiting for cover, pulling out the gun, and shouting are all good examples of how to increase the likelihood of violence during contact with a mentally ill subject. Defendant Wallace failed to utilize the available time and space to de-escalate and failed to consider

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

strategic disengagement. Defendant Wallace's conduct in this case was grossly at odds with Defendant County's "De-Escalation" policy 464.6, which provides:

> *Deputies should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis. . . . [Officers should:] . . . • Be patient, polite, calm, courteous and avoid overreacting. • Speak and move slowly and in a non-threatening manner. . . . • Provide for sufficient avenues of retreat or escape should the situation become volatile. Responding deputies generally should not: • Use stances or tactics that can be interpreted as aggressive. . . . Corner a person who is not believed to be armed, violent or suicidal. • Argue, speak with a raised voice or use threats to obtain compliance.*

4.107   In addition to the other failures that led to Ethan's death, Defendant Wallace was also inexplicably not carrying a non-lethal electroshock weapon (such as a Taser), a basic component of the less-than-lethal force compendium necessary to any law enforcement officer's ability to avoid unreasonable use of deadly force.

### A Homicide in Search of a Justification

4.108   Given the notable absence of "***the knife***," investigators considered several alternative items in a search to justify Ethan's death.

4.109   One possibility considered by was a black cell phone that investigators reported finding near the chain link fence (evidence marker "2"). A second possibility was a black deodorant stick that investigators reported finding near Ethan's body (marker "3"). A third possibility was a black lighter that investigators reported finding on the slope of the rocky outcropping (marker "4"). A fourth possibility was a pen that investigators reported finding on the slope of the rocky outcropping (marker "5").

4.110   Ultimately, investigators settled on a pair of "*black wayfarer sunglasses*" that they reported finding near the "*whispy tree*" (marker "6"):

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

1
2
3
4
5
6
7
8
9
10
11
12



Image source: "2019-10059590_566"

13      4.111  Defendant County ultimately endorsed the sunglasses theory, overlooking

14  Defendant Wallace's use of the terms *"knife," "blade,"* or *"handle"* on 14 different occasions

15  in his written statement as nothing more than a series of sincere mistakes.

16      4.112   Although Defendant Wallace's minute and repeated descriptions indicate that he

17  was carefully watching "*the knife,*" his statement does not indicate that Wallace saw or suspected

18  that "*the knife*" may have been dropped or flung before, during, or after the shooting. In fact,

19  Defendant Wallace told Deputy Criswell that Ethan still "*had a knife*" after rolling to the bottom

20  of the slope, justifying the officers' failure to provide immediate first aid during the critical first

21  minutes after the shooting. These facts are inconsistent with the theory that the sunglasses, still

22  resting at the top of the slope, was the item Wallace claims to have seen in Ethan's hand before

23  the shooting.

24

*Murray v. Spokane County et. al.*
COMPLAINT – Page 24 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

4.113   None of the written reports, body cam video, jail booking records, or 911 calls from Ethan's several contacts with law enforcement in the days leading up to the shooting indicate that Ethan, a homeless man who was not even wearing shoes when he was killed, was in possession of sunglasses.

4.114   Plaintiffs do not concede that the sunglasses were associated with Ethan.

4.115   Under the totality of circumstances alleged herein, Defendant Wallace's use of deadly force was unreasonable and excessive. Defendant Wallace's conduct showed reckless disregard for Ethan's constitutional rights.

4.116   Under the totality of circumstances alleged herein, Defendant Wallace acted intentionally, knowingly, recklessly, and/or maliciously in violation of Ethan's well-established rights under the Fourth Amendment to the United States Constitution.

4.117   Under the totality of circumstances alleged herein, Defendant Wallace's pursuit of Ethan and close-proximity approach on the rocky-outcropping was negligent and the foreseeable and proximate cause of the damages indicated below.

4.118   Defendant Wallace's actions caused damages to Ethan, now actionable by his Estate. Such damages include extreme pain, suffering, emotional and mental distress, and fear of impending doom, as well as his death and the loss of enjoyment of his life.

4.119   Defendant Wallace's actions in shooting and killing Ethan also deprived Plaintiffs, Justine L. Murray and Mark Jentsch, of the society and companionship of their son, in violation of their Fourteenth Amendment Rights under the United States Constitution, resulting in damages.

4.120   To the extent any state law limitations on damages sought by way of this complaint are purported to exist, they are inconsistent with the compensatory, remedial, and/or

*Murray v. Spokane County et. al.*
COMPLAINT – Page 25 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

punitive purposes of 42 U.S.C. § 1983, and any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

## V.  CLAIMS

5.1    Statements of fact in paragraphs 4.1–4.120 above are hereby re-incorporated as if fully stated herein for purposes of each claim below.

### First Cause of Action
### (Federal Law Claim – Violation of 42 U.S.C. § 1983 – Unreasonable Seizure)

5.2    Plaintiff Estate of Ethan Austin Murray, through its Personal Representative Justine L. Murray, asserts all available claims under 42 U.S.C. § 1983 for the deprivation of Ethan Murray's constitutional rights under the Fourth Amendment to the United States Constitution.

5.3    Plaintiff Justine Murray, as the mother of Ethan Murray, asserts her own individual claims under 42 U.S.C. § 1983 for the deprivation of the society and companionship of her son in violation of the Fourteenth Amendment to the United States Constitution.

5.4    Plaintiff Mark Jentsch, as the father of Ethan Murray, asserts his own individual claims under 42 U.S.C. § 1983 for the deprivation of the society and companionship of his son in violation of the Fourteenth Amendment to the United States Constitution.

5.5    Defendant Wallace is liable for compensatory and punitive damages for directly violating Ethan Murray's constitutional rights under the Fourth Amendment to the United States Constitution and indirectly violating Justine Murray's and Mark Jentsch's constitutional rights under the Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. 1983.

### Second Cause of Action
### (Federal Law Claim – Violation of 42 U.S.C. § 1983 – *Monell* Liability)

*Murray v. Spokane County et. al.*
COMPLAINT – Page 26 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

5.6     Defendant County is liable for its policy or custom of inadequately training deputies such as Defendant Wallace to recognize mental health symptoms, to recognize subjects in crisis, to de-escalate situations involving mental health and subjects in crisis, to provide medical assistance to subjects who have been shot, and to follow department guidelines for foot pursuits and the use of deadly force, foreseeably causing deprivations of Ethan Murray's right to freedom from unreasonable seizure of his person, as guaranteed by the Fourth Amendment to the Constitution and 42 U.S.C. § 1983.

5.7     Defendant County is liable for its widespread policy or custom of failing to correct, tolerating, or encouraging employee attendance at "Warrior Mindset" and/or "Killology" trainings that teach disregard for constitutional use of force, foreseeably creating a culture of excessive force and disregard for de-escalation, foreseeably causing deprivations of Ethan Murray's right to freedom from unreasonable seizure of his person, as guaranteed by the Fourth Amendment to the Constitution and 42 U.S.C. § 1983.

5.8     Defendant County is liable for unreasonably adopting the conclusions of the reckless and irresponsible investigation of Ethan Murray's death, thereby endorsing Defendant Wallace's deprivation of Ethan Murray's constitutional rights as consistent with internal policy.

### Third Cause of Action
**(State Law Claim – Tort of Negligence)**

5.9     Defendant Wallace is directly liable to Plaintiff Estate of Ethan Austin Murray, and Plaintiffs Justine Murray and Mark Jentsch, for compensatory damages resulting from his own breaches of the duty of reasonable care as the proximate cause of Ethan's wrongful death under RCW 4.20.010 and RCW 4.24.010 and for all economic and non-economic damages resulting therefrom.

*Murray v. Spokane County et. al.*
COMPLAINT – Page 27 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

1       5.10    Defendant County is vicariously liable to Plaintiff Estate of Ethan Austin Murray,

2    and Plaintiffs Justine Murray and Mark Jentsch, for compensatory damages resulting from

3    breaches of the duty of reasonable care for the actions of its employee, Defendant Wallace, done

4    within the scope and course of his employment, that proximately caused Ethan's wrongful death

5    under RCW 4.20.010 and RCW 4.24.010 and for all economic and non-economic damages

6    resulting therefrom.

### VI.  JURY DEMAND

6.1    Plaintiffs demand that this matter be tried by a jury.

### VII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

7.1    General and special compensatory damages under federal and state law, including but not limited to, pre-death pain and suffering, and loss of consortium, in amounts to be proven at trial and sufficient to compensate each Plaintiff for all damages for loss of enjoyment of life and loss of life, economic damages, and damages to Justine Murray, Mark Jentsch, and any beneficiary of the Estate of Ethan Austin Murray, provided for under federal or state law;

7.2    Punitive damages under federal law against individual Defendants in an amount to be proven at trial;

7.3    Plaintiffs' reasonable attorneys' fees, costs, and prejudgment interest incurred in pursuing this matter as provided in for in 42 U.S.C. § 1988 and to the extent otherwise permitted by law;

7.4    A declaration that the acts of Defendants violated the United States Constitution and an award of nominal damage for any such violation as deemed appropriate;

*Murray v. Spokane County et. al.*
COMPLAINT – Page 28 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989

7.5     Injunctive relief ordering Defendant County to expand its mental health field response capabilities, utilize mental health professionals to assist officers responding to crises involving persons with behavioral health issues, provide officers with preventive and follow-up training on mental health field response best practices, and to apply for funding for these measures under existing state laws RCW 36.28A.440 and RCW 36.28A.450;

7.6     Injunctive relief ordering Defendant County to obtain collective bargaining concessions that require officers to submit written statements within 24-hours of deadly force deployments as a condition of continued employment; and

7.7     Such other relief as the Court may deem just and equitable.

DATED this 29th day of July, 2021.

s/Braden Pence
Braden Pence, WSBA #43495
MAZZONE LAW FIRM, PLLC
3002 Colby Ave., Suite 302
Everett, WA  98201
Telephone:  425-259-4989
Facsimile:  425-259-5994
bradenp@mazzonelaw.com
   Attorney for Plaintiff's Estate and
Justine Murray, individually

s/Fred P. Langer
Fred P. Langer, WSBA #25932
NELSON LANGER ENGLE, PLLC
12055 15th Avenue NE, Suite 100
Seattle, WA  98125
Telephone:  (206) 623-7520
Facsimile:  (206) 622-7068
Email:  FredL@NLELaw.com
   Attorney for Plaintiff's Estate and
Justine Murray, Individually

s/Kevin W. O'Connor
Kevin W. O'Connor, ISBA #6216627
(Pro Hac Vice pending)
O'CONNOR LAW FIRM, LTD
19 S. LaSalle St., Suite 1400
Chicago, IL  60603
Telephone:  312-906-7609
Facsimile:  312-263-1913
firm@koconnorlaw.com
   Attorney for Plaintiff Mark Jentsch

*Murray v. Spokane County et. al.*
COMPLAINT – Page 29 of 29

MAZZONE LAW FIRM, PLLC
3002 COLBY AVENUE, SUITE 302
EVERETT, WA 98201
T: (425) 259-4989